IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH MLEZELL@LEZELLLAW.COM THAT IS STORED AT PREMISES CONTROLLED BY NETWORK SOLUTIONS | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher Westphal, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Network Solutions, an email provider headquartered at 12808 Gran Bay Parkway, West, Jacksonville, FL 32258.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under Title 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Network Solutions to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Internal Revenue Service Criminal Investigation Division, and have been since 2009.  I earned a Bachelor of Science degree in Accounting and Criminal Justice as well as a Masters of Accounting.  I am a Certified Public Accountant and a Certified Fraud Examiner.  Prior to IRS-CI I was a Special Agent with the U.S. Small Business Administration's Office of Inspector General.

3.      This affidavit contains information necessary to support a finding of probable cause for a search warrant.  This affidavit is based on your affiant's personal knowledge, knowledge obtained during this investigation through subpoenas and interviews, review of documents related to the investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through training and experience.  This affidavit is not intended to include each and every fact or matter known by the government.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that MARK LEZELL ("LEZELL") and ISSAM ABU-GHOSH ("GHOSH"), conspired to commit wire fraud, money laundering and tax offenses in violation of Title 18 U.S.C. §§1956; 1956(a)(1)(A)(i); 1957; 1343 and Title 26 U.S.C. §§7201 and 7206(1). This affidavit is presented in support of an application for a search warrant for information associated with the email address mlezell@lezelllaw.com, as further described in Attachment A, for evidence of these crimes further described in Attachment B.

## JURISDICTION

This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND CONCERNING EMAIL

5.      In my training and experience, I have learned that Network Solutions provides a variety of on-line services, including electronic mail ("email") access, to the public.  Network Solutions allows subscribers to obtain email accounts at the domain name

2

mlezell@lezelllaw.com, like the email account listed in Attachment A.  Subscribers obtain an

account by registering with Network Solutions.  During the registration process, Network

Solutions asks subscribers to provide basic personal information.  Therefore, the computers of

Network Solutions are likely to contain stored electronic communications (including retrieved

and unretrieved email for Network Solutions subscribers) and information concerning

subscribers and their use of Network Solutions services, such as account access information,

email transaction information, and account application information.  In my training and

experience, such information may constitute evidence of the crimes under investigation because

the information can be used to identify the account's user or users.

6.      In my training and experience, email providers generally ask their subscribers to

provide certain personal identifying information when registering for an email account.  Such

information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, alternative email addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number).  In my training and experience, such

information may constitute evidence of the crimes under investigation because the information

can be used to identify the account's user or users.  Based on my training and my experience, I

know that even if subscribers insert false information to conceal their identity, this information

often provides clues to their identity, location or illicit activities.

7.      In my training and experience, email providers typically retain certain

transactional information about the creation and use of each account on their systems.  This

information can include the date on which the account was created, the length of service, records

of log-in (i.e., session) times and durations, the types of service utilized, the status of the account

(including whether the account is inactive or closed), the methods used to connect to the account

3

(such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

8.      In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

9.      As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further,

information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the IP addresses from which users access the email account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## PROBABLE CAUSE

## I.    SCHEME OVERVIEW

10.    This affidavit arises out of a joint investigation by the IRS and the Federal Bureau of Investigation ("FBI") of an advance loan fee scheme.  Beginning in or about 2008, through 2013, LEZELL, and GHOSH, conspired to solicit refundable good faith deposits from individuals and businesses (hereinafter "borrower-victim") that were unable to obtain traditional loans in exchange for loans funded directly by Geneva Financial Consultants, LLC ("GFC"), a Delaware based corporation controlled by GHOSH, or facilitated through private investor contacts maintained by GFC.

11.     The scheme operated in a similar manner for many of the borrower-victims. Typically a borrower-victim was unable to obtain a loan through traditional means such as a bank.  The borrower-victims were often introduced to GHOSH through a third party.  GHOSH then represented to the borrower-victims that he could obtain the loan they required through various connections he maintained.  Prior to soliciting the potential lenders, GHOSH required that the borrower-victim provide a good faith deposit to be held in escrow to show that the borrower-victim's good intentions toward obtaining the loan.  LEZELL acted as the escrow agent for the good faith deposits.  Once an agreement was reached between the borrower-victim and GHOSH, the terms and conditions were memorialized in a Loan Commitment contract.  The Loan Commitment included an Escrow Agreement which identified LEZELL as the escrow agent and provided conditions under which the Escrow Agreement would operate including the transfer of the good faith deposit to a bank account held by LEZELL.  In most cases the escrow agreement required that LEZELL hold the money with the understanding that it would be returned to the borrower-victim once the lender was identified or if GHOSH failed to identify a lender.  Once the borrower-victims wired the money to LEZELL's account, most of the money was transferred within days out of LEZELL's account to in violation of the escrow agreement. In addition, LEZELL used the remaining money for personal expenses.

12.     Communications with borrower-victims of the scheme often occurred through email.  LEZELL used the email address mlezell@lezelllaw.com.

13.     Prospective borrower's good faith deposits, referenced within this affidavit, were wire transferred to Sun Trust Bank Account Number XXXXXXXX1674, a checking account owned solely and controlled by LEZELL and titled "Mark L. Lezell – Hold Account," (hereinafter the "Hold Account").

## II.     EXAMPLES OF THE SCHEME

14.     The following examples are representative of the general manner in which the scheme operated.  In  each situation the loans were neither funded nor were the good faith deposits returned:

### A. __Company A__

15.     Company A is an oil and energy business located in Melbourne, Australia.  In early 2011, Company A, along with another company hoped to raise $500 million dollars for development of oil fields in the Philippines.  Company A was referred to LEZELL and GHOSH who claimed that they could provide the funding but required $325,000 as a good faith deposit. Company A objected to the deposit amount and the parties agreed to $150,000 as the deposit.

16.     On February 15, 2011, LEZELL, using email account mlezell@lezelllaw.com, provided a copy of the Commitment Letter signed by GHOSH for GFC, and the Escrow Agreement, signed by LEZELL.  LEZELL wrote in the email, "Please note that the Commitment is provided Subject to the Escrow Agreement.  In the event the escrow is not funded, it is understood and agreed that the Commitment shall be void for all purposes and effects."  The Escrow Agreement outlined the duties and responsibilities of LEZELL as the escrow agent.  The Escrow Agreement prohibited any payment to GFC.  In addition, the deposit was to be returned to Company A whether the loan was funded or not.  Pursuant to the Commitment Letter, the loan was expected to be funded by within five business days of GFC's review and acceptance of financial information (promissory note), development plans and appraisal of collateral.  The Escrow Agreement also identified March 1, 2011, as the deadline by which the agreements would be executed.  If not funded by that date, the funds would be returned within ten calendar days.

7

17.     On February 17, 2011, as instructed in the Escrow Agreement, Company A wired $149,980 to LEZELL's Hold Account. On February 18, 2011, LEZELL, using the email account mlezell@lezelllaw.com, wrote, "Update:  11:30am Thursday received notice from SunTrust Bank as to receipt of your Deposit."

18.     On February 20, 2011, Company A asked LEZELL for an update on the lender proposed to fund the $500 million dollar loan.  LEZELL responded through email via mlezell@lezelllaw.com on February 21, 2011, that the lender "remains interested," and that the potential lender was preparing a list of questions and concerns.  LEZELL continued to ensure Company A representatives that the loan "was proceeding, but no one takes a day to value Collateral."   LEZELL's reassurance to Company A that a loan would be obtained continued when on February 24, 2011, he stated in an email, that the "prospective funding source is in the process of confirming the value of the Collateral."

19.     On February 26, 2011, Company A e-mailed LEZELL at mlezell@lezelllaw.com and requested the list of questions and concerns LEZELL referenced in an e-mail on February 20, 2011.  LEZELL responded on February 28, 2011, that he had a medical issue and was unable to provide them with information.

20.     In March 2011, well after the proposed date by which the loan would be funded, Company A and its' broker sent numerous emails to LEZELL requesting updates on the loan. LEZELL finally responded on March 18, 2011, and attached a letter drafted on GFC letterhead and signed by SHOSH confirming a thirty day extension for GFC/GHOSH to obtain funding.

21.     On April 6, 2011, LEZELL responded to Company A through e-mail at mlezell@lezelllaw.com advising that "the loan will soon close and I [LEZELL] intend to be able to finalize it".  On April 11, 2011, LEZELL, in an email to Company A that included GHOSH,

8

stated "this confirms that the Miami Bank is over-nighting delivery of instrument to fund loan." Despite LEZELL's representations, the loan was not realized.  GFC's extension to perform expired on April 18, 2011.  Company A sent multiple e-mails to LEZELL at mlezell@lezelllaw.com, and cc'd Ghosh at gfcllc@aol.com, on August 2, 2011, August 4, 2011, and December 23, 2011, requesting LEZELL return the $150,000 good faith deposit.  LEZELL never responded to the requests.

22.     A review of the Hold Account shows that prior to February 17, 2011, the account had a balance of $5,810.35.  On February 17, 2011, the Hold Account received a deposit of $149,980 from Company A.  One day later, on February 18, 2011, LEZELL wired $125,000 from the Hold Account to GHOSH's bank account.  Between February 18, 2011, and March 22, 2011, in addition to GHOSH, LEZELL made payments drawn upon the Hold Account to multiple payees including but not limited to Arena Stage, Republican Jewish Coalition, Bloomingdales, Southwest Airlines, and Costco.  By March 22, 2011, the Hold Account had a negative balance of -$25.72.  LEZELL's transfer of the money from the Hold Account to GHOSH and other payees was in direct violation of the Escrow Agreement with Company A.

23.     No loan was ever provided by or facilitated by GHOSH to Company A, and the deposit in the Hold Account was never returned to Company A.

**B.  <u>Company B</u>**

24.     Company B is an oil and gas exploration company located in Spokane, Washington.  In 2010, Company B began developmental drilling in California in hopes of expanding its business operations.   Company B sought $3.5 million dollars to support its expansion from traditional financers such as banks but was unable to obtain a loan.

25.     To find alternative sources of financing, Company B contacted Curing Capital, Inc., a consulting firm that specialized in introducing public and private companies to funding sources.  Curing Capital identified potential resources for a loan and eventually Company B was connected to GFC Consultants and GHOSH.  GHOSH told Company B that in order for GFC to secure the financing, Company B needed to provide an upfront deposit of $200,000 that would later be applied to the loan.

26.     On June 17, 2011, LEZELL, using the email account mlezell@lezelllaw.com, sent to Company B a Commitment Letter signed by GHOSH and Escrow Agreement signed by LEZELL.  On June 18, 2011, Company B signed and returned the agreements by email to mlezell@lezelllaw.com, and gfcllc@aol.com.  The Commitment Letter stated that GFC would provide the $3.5 million loan to Company B and Company B would provide $200,000 as evidence of their intention to proceed with the agreement.  The Escrow Agreement, signed by LEZELL, stated that the Escrow Agent would hold all funds in the trust account maintained for client funds, otherwise known as the "Hold Account."  The agreement further stated that "[t]here will be no distribution of said funds partial or otherwise until the first of the following occurrences . . . ."  The occurrences specified by the Escrow Agreement included:  (1) the inability of the parties to execute the agreements; (2) the closing of the loan; or (3) the inability to close on the loan prior to June 30, 2011.  The Escrow Agreement also stated that Company B had no responsibility to pay the Escrow Agent for services rendered.

27.     On June 20, 2011, Company B sent an email to LEZELL at mlezell@lezelllaw.com, that confirmed the deposit of $200,000 was wired to the Hold Account.  On June 20, 2011, LEZELL, using mlezell@lezelllaw.com, emailed Company B and GHOSH informing them that, "[t]he [d]eposit hit the 'pending' account, I'll advise as soon as funds

10

clear." On June 21, 2011, LEZELL confirmed via e-mail that Company B's good faith deposit was received at 10:15 a.m.

28.     On June 22, 2011, Company B communicated with LEZELL by email and asked to discuss the closing documents.  LEZELL responded using email account mlezell@lezelllaw.com, that he was waiting to hear from GHOSH.  After the June 30, 2011, deadline to fund the loan passed, and GFC had not funded the loan, the parties entered into agreements to extend the Commitment Letter.  The three signed extension requests were sent to Company B via e-mail by LEZELL, utilizing the e-mail address mlezell@lezelllaw.com, on July 8, 2011, July 15, 2011 and July 28, 2011.  The final date contemplated for completion of the agreement was August 12, 2011.

29.     In August 2011, Company B requested that LEZELL return the $200,000 good faith deposit.  In addition Company B's attorneys inquired, on April 18, 2012, as to the balance of LEZELL's escrow account.  Company B, however did not receive a response from either communication.

30.     Despite having failed to perform by both the original funding date or the extension dates, GHOSH continued to e-mail Company B soliciting additional funds and/or offering bogus/outlandish investment opportunities.  For example, GHOSH e-mailed Company B on October 24, 2011, with attachments soliciting Company B to pay an additional fee of $175,000.  In addition, on February 23, 2012, GHOSH forwarded Company B an e-mail suggesting an investment with a now deceased U.S. army officer who needed assistance in reclaiming $1 billion.  Company B replied the same day (February 23, 2012), advising GHOSH that the investment was a scam.

31.     A review of the Hold Account evidences that prior to June 20, 2011, the account had a negative balance of -$702.88.  On June 20, 2011, the Hold Account received a deposit of $200,000 from Company B.  In violation of the Commitment Letter and the Escrow Agreement, within two days of receiving Company B's deposit, LEZELL transferred $10,000 and $20,000 to two entities which had no knowledge, association or relationship to Company B.  Further on June 22, 2011, LEZELL wired $132,500 into GHOSH's Wachovia Account 2901.  By June 22, 2011, the balance in the Hold Account was $22,554.17.  By August 15, 2011, the Hold Account had a balance of $14.

32.     No loan was ever provided by GHOSH to Company B, and the deposit in the Hold Account was never returned to Company B.

**C. Additional Schemes**

33.     Your affiant is aware of other schemes similar to the two described.  Specifically, your affiant has contacted at least eight other people or companies that have been promised loans by GFC and/or GHOSH, and provided money to LEZELL to hold as the escrow agent.  In all cases, no loans have been provided.  In most cases, no deposit money has been returned.  Your affiant has identified several people who were returned deposits only after LEZELL and GHOSH obtained money from another borrower-victim.

34.     Your affiant has discovered that LEZELL and GHOSH have operated additional fraud schemes together.  For example, in 2008, GHOSH and LEZELL induced an investor in Fairfax, Virginia, Individual C, to participate in a short term investment scheme.  Both GHOSH and LEZELL represented, in person and electronically via email, to Individual C and his counsel that GHOSH was due a $130,000 commission related to a recent real estate closing and that GHOSH needed $50,000 to secure and obtain the commission.  GHOSH proposed to Individual

12

C a short term loan of $50,000, evidenced by a promissory note dated June 5, 2008 and signed

by GHOSH,  whereby GHOSH agreed to pay back the principal of $50,000 plus interest of

$20,000 within thirty days.  LEZELL served as the escrow agent in receipt of the $50,000 loan

and impressed upon Individual C and their representative the urgency of wiring the $50,000 to

the Hold Account.  In an email on May 27, 2008, using mlezell@lezelllaw.com, LEZELL further

advised that GHOSH's commission was held in escrow and that Individual C was the only cause

for delay.

35.     Individual C requested that GHOSH provide as collateral, property GHOSH

claimed to own in the event that GHOSH failed to meet the terms of the promissory note.

GHOSH claimed to own property in Virginia and Maryland.  LEZELL submitted a false HUD-1

Settlement Sheet (via e-mail mlezell@lezelllaw.com) that represented Westin Development, Llc

an entity controlled by GHOSH, as the current owner of the property.  Neither GHOSH

individually nor Westin Development, LLC owned property submitted as collateral. GHOSH

failed to return the money or commission, and failed to honor the signed promissory note.

Individual C called and emailed LEZELL and GHOSH requesting that the money be returned.

LEZELL and GHOSH never responded to his requests.

## III.   THE EMAIL ADDRESS

36.     On June 2, 2015, your affiant spoke with a representative from Web.com.

Web.com is the parent company to Network Solutions and maintains the records for Network

Solutions.  Web.com confirmed that the preservation letter was received and that the requested

material was preserved.  In general, an email that is sent to a Network Solutions subscriber is

stored in the subscriber's "mail box" on servers until the subscriber deletes the email.  If the

subscriber does not delete the message, the message can remain on servers indefinitely. Even if

the subscriber deletes the email, it may continue to be available on servers for a certain period of time.

## IV. TAX FILING HISTORY

37.     LEZELL has not filed a personal income tax return since 1990 and has earned at least $100,000 per year (2008 – 2012) relating to his participation in the referenced Advance Loan Fee Scheme.  Investor deposits, held in escrow and required to be returned within a set timeframe referenced in signed Escrow Agreements based upon the non-performance of GFC, were used towards repayment of prior borrower-victims deposits, unauthorized disbursements to GHOSH/GFC and apparent personal living expenses of LEZELL.

### POTENTIAL PRIVILEGED DOCUMENTS

38.     During the time of the scheme LEZELL was a licensed attorney and member of the Bar of the District of Columbia.  Due to LEZELL's occupation potentially privileged communications and documents may be present among the data described above.  As described further in Attachment C, to safeguard any privileges in this investigation, a filter team consisting of an Assistant United States Attorney ("AUSA"), a supervising AUSA and agents ("Filter Team"), all of whom are not involved in the investigation, will be used.

### CONCLUSION

39.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Network Solutions who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Christopher Westphal
Special Agent
Internal Revenue Service – Criminal
Investigation


Subscribed and sworn to before me on _____, 2015


_____
Honorable Alan Kay
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **mlezell@lezelllaw.com** that is stored at premises controlled by Network Solutions, a company that accepts service of legal process at **12808 Gran Bay Parkway, West, Jacksonville, FL 32258**.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Network Solutions (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 2, 2015, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of wire fraud, money laundering and tax offenses in violation of Titles 18 U.S.C. §1956; 1956(a)(1)(A)(i); 1957; 1343 and Title 26 U.S.C. §7201 and 7206(1), those violations involving MARK LEZELL and ISSAM ABU-GHOSH and occurring between 2008 and 2013, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

> (a) Emails evidencing communications in furtherance of the frauds between the email account owner and victims of the fraud schemes, between the email account owner and individuals whose assistance furthered the fraud schemes, preparatory steps taken in furtherance of the scheme, and identification of yet unknown co-conspirators.

> (b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

> (c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

> (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

> (e) The identity of the person(s) who communicated with the user ID about matters relating the fraud schemes including records that help reveal their whereabouts.

<u>ATTACHMENT C</u>

<u>FILTER TEAM PRACTICES AND PROCEDURES</u>

<u>Filter team membership</u>

- An AUSA from the United States Attorney's Office for the District of Columbia who is not part of the case prosecution/investigation team, and will never be so in the future.

- A federal agent(s) who is not part of, or connected in any way to, the case investigation/prosecution team.

<u>Items to be reviewed by filter team</u>:

- Emails and email attachments

<u>Filter team review procedures</u>

1. The Filter Team will run search terms against the seized data, designed to identify potentially privileged communications with counsel among the relevant files, and the results of these searches – i.e., the potentially privileged communications with counsel – will be segregated from the remaining data.

2. Only the Filter Team will have access to this information on the government's databases, and the databases will be programmed to deny access to anyone other than a Filter Team member who seeks to view such files.

3. The filter team AUSA will divide all relevant materials into four categories:

   a. Privileged information ("category a");

   b. Potentially privileged information ("category b");

   c. Privileged or potentially privileged information that may fall into the crime-fraud exception of the attorney-client privilege ("category c"); and

   d. Non-privileged information ("category d").

4.  The filter team AUSA will determine whether any information in category (b) and category (c) falls outside the attorney-client privilege due to waiver, an exception to the privilege, or the like.

5.  The filter team AUSA will submit to the Court, under seal, a copy of all items from categories (b), and (c), and seek the Court's final determination concerning whether the submitted materials are protected by attorney-client privilege.

6.  The filter team AUSA will forward to the investigation/prosecution team the materials determined to fall in category (d) (non-privileged information).

7.  The filter team AUSA will forward to the investigation/prosecution team all materials the Court determines are not protected by attorney-client privilege, or fall into an exception to the privilege.

8.  At the conclusion of this process, the Filter Team will return all privileged materials to counsel for the subscriber of the Target Account.

9.  At the conclusion of this process, the Filter Team will permanently delete all privileged materials from any databases, and will destroy any copies.

## **CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Network Solutions, and my official title is _____.  I am a custodian of records for Network Solutions.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Network Solutions, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Network Solutions; and

c.      such records were made by Network Solutions as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.


_____          _____
Date                                                     Signature

3